FILED

OCT 2 6 2022

Clerk, U. S. District Court
Eastern District of Tennessee
At Knoxville

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**KNOXVILLE DIVISION**

IN THE MATTER OF THE APPLICATION )
OF THE UNITED STATES OF AMERICA )  Case No. **3:22-MJ-2187**
FOR A SEARCH WARRANT AUTHORIZING )
THE RELEASE OF HISTORICAL )
CELL-SITE INFORMATION AND REAL-TIME )  **(Under Seal)**
GEO-LOCATION INFORMATION WITH )
REGARD TO T-MOBILE )
TELEPHONE NUMBER (865) 888-3813 )

## AFFIDAVIT IN SUPPORT OF APPLICATION
## FOR SEARCH WARRANT

I, John Sharp, a task force officer with the Federal Bureau of Investigation, being duly sworn, depose, and state as follows:

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number (865) 888-3813 (**Target Cellular Device 1**), which is all serviced by T-Mobile.

2.      Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act. *See* 18 U.S.C. §§ 3121-3127. The requested warrant therefore includes all the information required to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1). **Target Cellular Device 1** is particularly described herein and in **Attachment A**, and the location information to be seized and the investigative techniques to be employed are described herein and in **Attachment B**.

1

3.    I am a police officer and have been employed by the Knox County Sheriff's Office since January 2007.  I graduated from the Knox County Sheriff's Regional Training Academy in 2009, and I hold a bachelor's degree in Psychology from the University of Tennessee. I have been a Tennessee P.O.S.T certified officer since 2009, and I am currently a detective with the Knox County Sheriff's Office Narcotics Unit.  I am also assigned to the Federal Bureau of Investigation (FBI) as a Task Force Officer (TFO) in the Appalachian High Intensity Drug Trafficking Area (AHIDTA).  I attend at least 40 hours of in-service training annually in order to remain knowledgeable in the current techniques and law as it pertains to law enforcement, and I have attended at least 100 hours of narcotics-specific investigative training including the investigation and prosecution of narcotics - related offenses, as well as, the writing, planning and execution of narcotics - related search warrants as taught by instructors from the Regional Counter-Drug Taskforce.  I have completed the Tennessee Bureau of Investigation wiretap school which consists of 40 hours of instruction regarding electronic surveillance.  I am currently certified as an Advanced Emergency Medical Technician, a HazMat operations officer, and I have been certified as a Drug Recognition Expert.

4.    While conducting or participating in these investigations, I have been involved in the use of the following investigative techniques: interviewing informants, confidential sources, and cooperating witnesses, conducting physical surveillance, consensual monitoring and recording of both telephonic and non-telephonic communications; preparing tracker and geo-location warrants; and preparing and executing search warrants and arrest warrants that have led to the arrests of subjects.

5.    As a result of my personal participation in the investigation detailed below, through interviews with, and analysis of reports submitted by other law enforcement officers of

2

partnering agencies, I am familiar with all aspects of this investigation. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other officers and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6. Based on the facts set forth in this affidavit, I believe there is probable cause that Duane CARTER, and other co-conspirators known and unknown, are trafficking heroin[1] and/or fentanyl in violation of Title 21, United States Code, Sections 846 and 841(a)(1). I believe there is sufficient evidence to find probable cause that location information described in **Attachment B** will assist law enforcement with the on-going investigation of a Drug Trafficking Organization ("DTO") led by Duane CARTER.

7. The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

8. One purpose of applying for this warrant is to determine with precision the locations of **Target Cellular Device 1**. Based on the details of investigation, there is probable cause to believe that **Target Cellular Device 1** are currently located somewhere within the Eastern District of Tennessee. Pursuant to Rule 41(b)(1), a magistrate judge with authority in the

---

[1]The term "heroin" has evolved from the historical and specific chemical compounds which make up true heroin, such as diacetylmorphine and diamorphine. "Heroin" now commonly refers to any number of narcotic analgesics such as fentanyl, acetyl fentanyl, and p-fluorofentanyl which produce a similar high and are cheaper and easier to obtain. Drug buyers and drug sellers commonly use the term "heroin" as a collective term encompassing any of the narcotic analgesic drugs.

3

district has authority to issue a warrant to search for and seize a person or property located within the district. Such property would include the location of **Target Cellular Device 1.**

## PROBABLE CAUSE

### Investigation Background

9. Since approximately April 2022, the Knox County Sheriff's Office (KCSO) and / or the Federal Bureau of Investigation (FBI) have been investigating a DTO managed by Duane CARTER. The investigation has included controlled purchases of fentanyl directly from Duane CARTER and other members of the CARTER DTO, multiple search warrants, and interviews. During the investigation, law enforcement identified multiple cellular telephones used by the CARTER DTO to distribute controlled substances.

10. In April 2022, a confidential human source ("CHS") identified **Target Cellular Device 1** as being used by CARTER and members of the CARTER DTO to facilitate illegal drug sales. CHS is not an anonymous source and has interacted directly with investigators involved in this investigation. CHS has been cooperating with law enforcement for approximately 1 year and is currently motivated by monetary compensation. CHS has been interviewed by law enforcement. A portion of the interviews were in-person, the interviewing agents are fully aware of CHS's identity, and CHS did not attempt to obscure his or her identity in any manner. The requirement that CHS provide only truthful information was stressed to CHS at the beginning of his/her cooperation. To date, no information received from CHS is believed to be dishonest or unreliable. The CHS has assisted law enforcement on more than 30 occasions. The CHS' cooperation has led to the arrest of more than 14 people on federal drug trafficking charges, the seizure of assets and currency, as well as the seizure of illegal drugs. For these reasons, and as demonstrated herein, I believe information received from CHS to be reliable and true and

4

accurate to the best of my knowledge. CHS is familiar with CARTER and member of the CARTER DTO and their affiliation with narcotics trafficking. CHS has direct access to CARTER and the CARTER DTO via CARTER's cell phone. To the extent possible, information provided by the CHS has been corroborated by law enforcement.

11.    During the course of the investigation, investigators have utilized **Target Cellular Device 1** to contact CARTER and other members of the CARTER DTO, to arrange the purchase of heroin.

12.    Since April 2022, investigators have directed the controlled purchase of heroin from the CARTER DTO on at least 15 occasions.  During these 15 controlled purchases of heroin, **Target Cellular Device 1** has been utilized at least five times to facilitate the drug deal, most recently on September 29, 2022.

13.    On September 21, 2022, investigators executed search warrants at two locations associated with the CARTER DTO.

14.    A search of these residences revealed over 400 grams of powder which field tested positive for fentanyl, five handguns, and a drug phone, which investigators had contacted to arrange numerous controlled purchases of heroin from members of the CARTER DTO.  This drug phone was not **Target Cellular Device 1**, which is still active as of the date of this affidavit.

15.    Most recently, on September 29, 2022, investigators conducted a controlled purchase of heroin directly from Duane CARTER.  The CHS contacted CARTER on **Target Cellular Device 1** and arranged the purchase of 16 grams of heroin.

16.    CARTER identified a meet location and arrived shortly thereafter, where he completed the drug deal with CHS.

5

17. The CHS and the CHS' vehicle were searched from contraband both before and after the controlled purchase, and no contraband was found.

18. The ability to locate and generally track **Target Cellular Device 1** possessed by CARTER will significantly aid in the location, arrest, and subsequent prosecution.

19. In my training and experience, I have learned that T-Mobile is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the cellular telephones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (*i.e.*, antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (*i.e.*, faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

20. Based on my training and experience, I know that T-Mobile can collect E-911 Phase II data about the location of **Target Cellular Device 1** by initiating a signal to determine the location of **Target Cellular Device 1** on T-Mobile's network or with such other reference points as may be reasonably available.

6

21. I also know that T-Mobile can collect cell-site data about **Target Cellular Device 1**. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as T-Mobile typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

## MANNER OF EXECUTION

22. In my training and experience, I have learned that cellular phones and other cellular devices communicate wirelessly across a network of cellular infrastructure, including towers that route and connect individual communications. When sending or receiving a communication, a cellular device broadcasts certain signals to the cellular tower that is routing its communication. These signals include a cellular device's unique identifiers.

23. To facilitate execution of this warrant, law enforcement may use an investigative device or devices capable of broadcasting signals that will be received by **Target Cellular Device 1** or receiving signals from nearby cellular devices, including the **Target Cellular Device 1**. Such a device may function in some respects like a cellular tower, except that it will not be connected to the cellular network and cannot be used by a cell phone to communicate with others. The device may send a signal to **Target Cellular Device 1** and thereby prompt it to send signals that include the unique identifier of the device. Law enforcement may monitor the signals

7

broadcast by **Target Cellular Device 1** and use that information to determine the **Target Cellular Device 1's** location, even if it is located inside a house, apartment, or other building.

24.     The investigative device may interrupt cellular service of phones or other cellular devices within its immediate vicinity. Any service disruption to non-target devices will be brief and temporary, and all operations will attempt to limit the interference with such devices. However, the use of such investigative device will not affect **Target Cellular Device 1** or any non-target devices' ability to contact the emergency 911 system. In order to connect with **Target Cellular Device 1**, the device may briefly exchange signals with all phones or other cellular devices in its vicinity. These signals may include cell phone identifiers. The device will not complete a connection with cellular devices determined not to be one of **Target Cellular Device 1**, and law enforcement will limit collection of information from devices other than **Target Cellular Device 1**. To the extent that any information from a cellular device other than **Target Cellular Device 1** is collected by the law enforcement device, law enforcement will delete that information, and law enforcement will make no investigative use of it absent further order of the court, other than distinguishing **Target Cellular Device 1** from all other cellular devices.

## AUTHORIZATION REQUEST

25.     Based on the foregoing, I request that the Court issue the proposed search warrant for both historical cell-site and real-time prospective geo-location information, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

26.     This investigation concerns a drug trafficking organization that is operating in the Eastern District of Tennessee; it involves the use of confidential sources, surveillance, and other investigative methods. I therefore request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay

8

notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of **Target Cellular Device 1** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person(s) an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

18.     I further request that the Court direct the relevant wireless provider to disclose to the government any information described in Attachment B that is within the possession, custody, or control of the wireless provider. I also request that the Court direct the wireless provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the wireless provider's services, including by initiating a signal to determine the location of **Target Cellular Device 1** on the wireless provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate the wireless provider for reasonable expenses incurred in furnishing such facilities or assistance.

9

27. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

_____
JOHN SHARP
Task Force Officer
Federal Bureau of Investigation

SWORN TO AND SUBSCRIBED before me this 5th day of October, 2022.

_____
JILL E. MCCOOK
United States Magistrate Judge

10

# ATTACHMENT A

## Particular Items to be Searched

The cellular telephone assigned call number (865) 888-3813 ("**Target Cellular Device 1**"), whose service provider is T-MOBILE, which is being used by Duane CARTER. It is ordered that any Wireless Provider that is associated with (865) 888-3813, furnish the information outlined in **Attachment B**.

Information about the location of **Target Cellular Device 1** that is within the possession, custody, or control of T-Mobile, including information about the location of the cellular telephone even if it is subsequently assigned a different call number.

# ATTACHMENT B

## Particular Items to be Seized

All information, including historic, current and future data, about **Target Cellular Device 1** and location described in **Attachment A** for a period of sixty days prior to and through sixty days after the issuance of this search warrant, both day and night. Information about **Target Cellular Device 1** includes all subscriber information, MIN/ESN/IMSI/MSID and billing information, call logs for both received and transmitted phone numbers, time at which calls were placed, duration of the calls, SMS/MMS data including numbers to which messages were sent to, cell site activations, precision tracking through the use of GPS, per call measurement data (PCMD), RTT, NELOS and other location data calculated by the provider. "Information about the location of **Target Cellular Device 1**" also includes all available E-911 Phase II data, GPS data, latitude-longitude data, Per Call Measurement data (PCMD) and other precise location information, as well as all current and historical call detail records and cell site information, to include data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) and azimuth received a radio signal from the cellular telephone described in **Attachment A**.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of T-Mobile is required to disclose the Location Information to the government. In addition, T-Mobile must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with T-Mobile services, including by initiating a signal to determine the location of **Target Cellular Device 1** on T-Mobile's network or with such other reference points as may be reasonably

1

available, and at such intervals and times directed by the government. The government shall compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance. As so defined, this search warrant, as herein ordered by the Court, orders the authorization and implementation of a pen register and trap ad trace device, for the noted time period, pursuant to Rule 41 of the Federal Rules of Criminal Procedure and Title 18, United States Code, §§ 2510, 2703, 3122, and 3123. Said pen register and trap and trace implementation shall be implemented contemporaneously with any other provisions of this warrant, and shall not only apply to the current denoted number, but to any number associated with the same ESN or IMEI of the target device.

Pursuant to an investigation of Duane CARTER and the CARTER DTO for violations of Title 21, United States Code, Sections 846, and 841(a)(1), this Warrant authorizes the officers to whom it is directed to determine the location of the cellular devices identified in **Attachment A** by collecting and examining radio signals emitted by the target cellular device for the purpose of communicating with cellular infrastructure, including towers that route and connect individual communications; and radio signals emitted by the target cellular device in response to radio signals sent to the cellular device by the officers for a period of sixty days, during all times of day and night. This warrant does not authorize the seizure of any tangible property.

2